UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL J. LILLIE,

         Plaintiff,

   -against-              7:12-CV-0862 (LEK)

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,[1]

         Defendant.

## MEMORANDUM-DECISION and ORDER

**I. INTRODUCTION**

This is an action for judicial review the Commissioner of the Social Security Administration's ("SSA") final decision denying Plaintiff Michael J. Lillie disability benefits. Both parties have filed briefs. Dkt. Nos. 10 ("Plaintiff's Brief"); 13 ("Defendant's Brief"). For the reasons discussed below, the case is remanded to the SSA to: (1) further develop the administrative record; and (2) re-evaluate Plaintiff's claim under the correct legal standards.

**II. BACKGROUND**

 **A. Factual History**

Plaintiff is a thirty-eight-year-old man with a history of polysubstance abuse, depression, obesity, lower back injury, and traumatic brain injury. Dkt. No. 8 ("Transcript") at 4; 267-71; 392-93. Plaintiff has a General Education Development diploma and has held several job positions in restaurant maintenance. Tr. at 270, 424. In April 2001, Plaintiff was admitted to Samaritan

---

[1] On February 14, 2013, Carolyn W. Colvin took office as Acting Social Security Commissioner, replacing Michael Astrue. She has been substituted as the named Defendant in this matter pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

Medical Center and treated by Dr. Robert Kimball following a motor vehicle accident. Tr. at 391-93. Plaintiff was diagnosed with a cerebral concussion and underwent two CT head scans and a neurological exam; all results came back normal. Id.

In June 2007, Plaintiff was administered a psychological assessment by Dr. Thomas Knudsen pursuant to a Jefferson County Department of Social Services referral. Tr. at 261-65. Plaintiff reported having been "involved in special education." Tr. at 262. Dr. Knudsen administered several tests, including the Kaufman Brief Intelligence Test ("KBIT"), Beck Depression Inventory, and Minnesota Multiphasic Personality Inventory. Id. Plaintiff was able to complete the KBIT but could not understand the questions on the other tests well enough to formulate a response. Id. at 261, 264. Dr. Knudsen noted that the KBIT, used to ascertain cognitive functioning, placed Plaintiff in the "mental retardation range" with a standard IQ score of 65. Id. at 263. Dr. Knudsen highlighted that the disparity between Plaintiff's IQ scores—where Plaintiff scored in the twenty third percentile on his verbal IQ and in the 0.1 percentile on his nonverbal IQ—was indicative of head trauma, especially because Plaintiff did not have a diagnosed history of mental retardation.[2] Id. Dr. Knudsen stated that there was a significant issue with Plaintiff's cognitive functioning and that Plaintiff required a neuropsychological and neuropsychiatric evaluation. Id. at 264-65. Dr. Knudsen concluded that Plaintiff was not then able to care for his children due to his depression, impulse problem, addiction, and low IQ. Id. at 266.

A few months later, Plaintiff was seen by Dr. Lei Lu for a neuropsychological evaluation. Tr. at 394-97. Plaintiff told Dr. Lu that "he was in special education classes in almost all subjects."

---

[2] The KBIT is not, however, designed to specify or diagnose traumatic brain injuries. Tr. at 263.

Id. at 394. Dr. Lu administered a number of tests and interviewed Plaintiff; Dr. Lu noted that the neuropsychological exam revealed average premorbid intelligence. Id. On the Westchester Adult Intelligence Scale ("WAIS"), Plaintiff exhibited a "lower than expected" IQ of 78, with a verbal IQ of 87 (19th percentile) and a non-verbal IQ of 73 (4th percentile). Id. at 396. Dr. Lu noted that the "discrepancy is consistent with what would be expected of people with an acquired brain injury." Id. A "wordlist learning and memory test (HVLT-R)" revealed that Plaintiff's "initial learning, delayed recall, and recognition all were impaired." Id. Dr. Lu diagnosed Plaintiff with cognitive disorder due to traumatic brain injury, depressive disorder, and anxiety disorder, and recommended a psychiatric evaluation. Id.

Plaintiff saw his primary care physician, Dr. Shara Peets, at Evans Mills Family Health Center for back pain following a work injury and dental pain in September 2007. Tr. at 275. Plaintiff indicated that he suffered a herniated disc at work two years prior and noted issues with depression, for which treatment was previously recommended but not given. Id. at 275-76. Dr. Peets prescribed Cymbalta, Neurontin, Celebrex, and Chantix but would not prescribe pain medication to treat dental pain. Id. Plaintiff's physical evaluation yielded normal results and he was given an order for physical therapy and a follow-up appointment with Dr. Peets. Id.

A few days later, Plaintiff was evaluated at Samaritan Medical Center Addictions Program for depression and anxiety. Tr. at 269-72. Plaintiff reported to Dr. Martiza Santana-Garcia that his mood was depressed and anxious due to the recent death of his brother, and that he had been prescribed Seroquel and Symbalta by his primary care physician to help with sleep. Id. Dr. Santana-Garcia diagnosed Plaintiff with depressive disorder, polysubstance dependence, and cognitive disorder. Dr. Santana-Garcia prescribed the continuance of Plaintiff's psychiatric

3

medication to treat insomnia, without changes in dosage. Id. at 272.

Dr. William Kimball, a psychologist, evaluated Plaintiff on March 24, 2008. Tr. at 375-80. Plaintiff expressed concerns about alcohol, marijuana, crack cocaine, and pain pills. Id. at 375. Upon evaluation, Dr. Kimball observed that Plaintiff's expressive language skills were normal and his mood was depressed. Id. at 375-76. On April 29, 2008, Plaintiff followed up with Dr. Peets for his complaint of lower back pain. Tr. at 274. Dr. Peets noted that Plaintiff was alert with no acute distress. Id.

Plaintiff was given a psychiatric and intelligence evaluation by Dr. Jeanne A. Shapiro, a consultative physician, in April 2009. Tr. at 424-33. Plaintiff reported that he was employed as a dishwasher and maintenance person working 18-24 hours per week. Id. at 424. Plaintiff indicated that "Social Security" told him he could not work more than 97 hours a month. Id. Dr. Shapiro stated that Plaintiff, although functioning within the range of mild mental retardation, appeared capable of performing many tasks involving understanding and following instructions. Id. at 427. Dr. Shapiro noted that the results of her examination were inconsistent with Plaintiff's allegations of depression and cognitive impairment. Id. Dr. Shapiro stated in the psychiatric evaluation that the "reported psychiatric symptoms were mild and transient in nature, not atypical for someone in his situation." Id. As part of the intelligence evaluation, Dr. Shapiro administered a "standardized intelligence measure (WAIS-III)," which yielded a verbal IQ of 74 and performance IQ of 67, totaling a full-scale IQ of 68. Id. at 431. She concluded that "[Plaintiff] can work in an appropriate setting in a position for which he has been adequately trained for." Id.

The same day, Plaintiff was given an internal medicine examination by consultative physician Dr. Magurno. Tr. at 434-38. Plaintiff complained of a diminished memory, headaches,

4

and lower back pain.  Id. at 435.  Plaintiff was diagnosed with a history of traumatic brain injury, seizures, and lower back pain, with a "stable" prognosis for all.  Id. at 437.  Dr. Magurno noted moderate limitations for repetitive bending, lifting, and carrying, and mild limitations for walking and standing.  Id.  An x-ray of Plaintiff's lumbosacral spine yielded "no acute bone abnormality," however, radiologist Lawrence S. Lieberman noted spinal bifida occulta at L5.  Tr. at 437, 439.  A week later, Industrial Medicine Associates sent Plaintiff a note indicating an abnormality on his x-ray.  Tr. at 440.

On April 24, 2009, Mr. Morog, a state-agency psychological consultant, reviewed evidence on record and found that, although Plaintiff had mild-to-moderate impairment in his adaptive and functional abilities, his impairment did not constitute a disability.  Tr. at 441-54.  In establishing Plaintiff's mental residual functioning capacity ("RFC"), Mr. Morog stated that "allegations of psychiatric impairment are credible but evidence from the MER does not support sufficient severity to establish disability."  Tr. at 459.  In establishing physical RFC, Mr. Morog stated that "based on the current medical information Dr. Magurno's MSO is consistent with the file."  Tr. at 465.  Mr. Morog further noted that although "based on the current medical information [Plaintiff] is able to perform light work, [Plaintiff] is unable to perform past work";  he accordingly found Plaintiff "not disabled."  Tr. at 466.

Plaintiff visited Dr. Lu for a neuropsychological reevaluation in June of 2009.  Tr. at 467-69.  Dr. Lu diagnosed Plaintiff with cognitive disorder not otherwise specified, history of traumatic injury, and depressive disorder.  Id. at 469.  Dr. Lu recommended an adjustment of Plaintiff's medication, a brain MRI to rule out structural abnormalities, and a follow-up neuropsychological evaluation.  Id.  Dr. Lu stated that the cognitive impairments revealed by testing "[were] sufficient

5

to interfere with [Plaintiff's] daily functioning and to render him at least partially occupationally disabled." Id.

Between April 2009 and December 2009, Plaintiff saw Dr. Peets nine times. Tr. at 480-95. He complained of headaches with increasing duration and intensity. Id. On July 16, 2009, Plaintiff saw Dr. Peets at the Magnetic Imaging Center for a brain MRI. Tr. at 467-69. Dr. Peets noted that there was bilateral maxillary and mild ethmoid paranasal sinus mucosal disease. Id. at 470. On September 16, 2009, Dr. Peets recommended that Plaintiff should not return to his previous occupation and found Plaintiff totally disabled. Tr. at 473.

On January 30, 2010, Plaintiff saw Dr. Peets and complained that Verelan was ineffective in easing his headache pain. Tr. at 478. Plaintiff also reported that he had been prescribed hydrocodone after prior dental work, which relieved his headache. Id. Dr. Peets advised Plaintiff that she would not prescribe controlled pain medication for his headache. Id. Plaintiff asked if Dr. Peets would prescribe controlled pain medication for his back pain. Id. On February 22, 2010, Dr. Abdul Latif of North Country Neurology PC sent Dr. Peets notes of his consultation with Plaintiff. Tr. at 474-75. Dr. Latif noted that he reviewed Plaintiff's 2009 MRI and found it to be normal. Id. at 475. Dr. Latif further noted that upon examination, Plaintiff did not appear in any discomfort. Id. Dr. Latif assessed Plaintiff's complaints of chronic headaches, dizzy spells, post-concussion syndrome and "seizures"; scheduled Plaintiff for an EEG study; and prescribed Excedrin, Cymbalta, and Topamax. Id. On February 24, 2010, Dr. Peets saw Plaintiff for a follow-up regarding his post-traumatic headache. Id. at 476. Dr. Peets noted that Plaintiff was to follow up with Dr. Latif and the pain clinic. Id. Dr. Peets also noted that patient was "argumentative and insistent regarding receiving controlled medications." Id.

6

**B. Procedural History**

Plaintiff filed for disability insurance benefits and Supplemental Security Disability Insurance ("SSDI") on February 19, 2009. Tr. at 143-148. The SSA denied the application on April 29, 2009. Id. at 1-3. Plaintiff filed a request for a hearing on June 18, 2009, and appeared before Administrative Law Judge ("ALJ") Robert Gale on July 14, 2010. Id. at 44. On November 2, 2010, the ALJ administered an unfavorable decision. Id. at 23-25. The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security on May 11, 2012. Id. at 1-3.

**C. The ALJ's Decision**

The ALJ found that Plaintiff met the SSA's disability insured status requirements through December 31, 2013, and had significant work activity from February 1, 2009—the alleged onset date—through June 10, 2009. Tr. at 28. However, according to the ALJ, the record did not clearly establish that Plaintiff had engaged in substantial gainful activity. Tr. at 28. Additionally, the ALJ found that Plaintiff had the following "severe" impairments: traumatic brain injury; low back disorder; obesity; depression; and history of polysubstance abuse; but did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Id. at 29-30. The ALJ further opined that Plaintiff had the RFC to perform light work with nonexertional mental limitations and should avoid working at unprotected heights or around dangerous moving machinery. Id. at 32. The ALJ concluded that, althoughPlaintiff was unable to perform any past relevant work, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. Id.

## III. LEGAL STANDARD

### A. Standard for Benefits

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Moreover, a Plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

In determining whether a Plaintiff has a disability, the Commissioner applies a five-step process. See 20 C.F.R. §§ 404.1520, 416.920. "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24 (2003). The five-step process is as follows:

> First, the Secretary considers whether the Plaintiff is currently engaged in substantial gainful activity. If he [or she] is not, the Secretary next considers whether the Plaintiff has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities. If the Plaintiff suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the Plaintiff has an impairment which is listed in Appendix 1 of the regulations. If the Plaintiff has such an impairment, the Secretary will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a Plaintiff who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the Plaintiff does not have a listed impairment, the fourth inquiry is whether, despite the Plaintiff's severe impairment, he [or she] has the residual functional capacity

to perform his past work. Finally, if the Plaintiff is unable to perform his past work, the Secretary then determines whether there is other work which the Plaintiff could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2nd Cir. 1996) (citations omitted). The plaintiff bears the burden of proof with regard to the first four steps; the Commissioner bears the burden on the fifth step. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

**B. Standard of Review**

In reviewing an SSA decision, a court's role is to determine whether the ALJ's findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); Featherly v. Astrue, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. of N.Y. v. NLRB., 305 U.S. 197, 229 (1938). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. Featherly, 793 F. Supp. 2d at 630.

The reviewing court should not affirm an ALJ's decision if it reasonably doubts that the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). If the ALJ applied the correct legal standards, the decision must be upheld "even where substantial evidence may [also] support the plaintiff's position." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992); see also Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982). In order to satisfy the "substantial evidence" standard, an ALJ's conclusions must be supported by "such *relevant* evidence as a reasonable mind might accept as adequate to support a conclusion." Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The reviewing court may not determine *de novo* whether an

individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). It must afford the SSA's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

**IV. DISCUSSION**

Plaintiff argues that: (1) the Commissioner erroneously failed to find that Plaintiff suffers from a listing-level cognitive deficit based on traumatic brain injury; (2) the Commissioner failed to properly evaluate the medical opinions in the record; (3) the Commissioner erroneously failed to follow the required steps in considering Plaintiff's mental disorder; and (4) there is no substantial evidence to support the Commissioner's conclusion that there is significant work in the national economy that Plaintiff can perform. Pl.'s Br. at 3.

**A. ALJ's Determination of Listing-Level Impairments**

The ALJ's finding that Plaintiff did not meet any Listing 12.05 impairment was supported by substantial evidence in the record. Although Plaintiff's IQ scores may satisfy 12.05(C), the record does not support an onset date of impairment prior to age 22. See 20 C.F.R. pt. 404, subpart P, Appendix 1. At step three, the SSA considers the severity of a plaintiff's medical impairments to determine whether they meet any of those listed in Appendix 1. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The regulations in Appendix 1 are "acknowledged by the [Commissioner] to be of sufficient severity to preclude substantial gainful activity; therefore, a claimant who meets or equals a listing is conclusively presumed to be disabled and entitled to benefits." Id.; Miller v. Astrue, No. 07-CV-1093, 2009 WL 2568571 *3 (N.D.N.Y. 2009).

In order to be found disabled based on intellectual disability under Listing 12.05, a plaintiff must prove that she satisfies: (1) the definition in the introductory paragraph of Listing 12.05; and (2) the criteria listed in any of subsections A, B, C, or D. See 20 C.F.R. pt. 404, Subpart P, Appendix 1. The introductory paragraph of Listing 12.05 requires that the deficits be "during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." Id. Section 12.05(C) provides that those individuals with IQ's in the range of 60 through 70 may be found disabled upon a showing that they have an additional limitation that imposes a significant limitation on their ability to work. Id.

The ALJ found that "while the [Plaintiff] obtained some IQ scores of 70 or less, the record does not establish onset of the impairment prior to age 22 or significant deficits in adaptive functioning." Tr. at 31, 32. Dr. Knudsen opined that the disparity in Plaintiff's IQ score was indicative of head trauma. Tr. at 263-64. Dr. Lu administered tests and concluded that Plaintiff was of average premobrid intelligence. Tr. at 394. Dr. Lu's diagnosis of cognitive disorder due to traumatic brain injury was consistent with Dr. Knudsen's opinion. Tr. at 396. Dr. Peets treated Plaintiff for post-traumatic headaches, and Dr. Latif assessed Plaintiff for post-concussion syndrome. Tr. at 475-6. The relevant opinions in the record consistently indicate that Plaintiff's mental impairment resulted from head trauma. The ALJ's conclusion that Plaintiff did not meet Listing 12.05 is supported by the consistent medical opinions of the record.

**B. Weight Given to Opinions of Record**

The ALJ erred in weight assignment to opinions record opinions. The ALJ is required to give a treating physician's opinion as to the nature and severity of the impairment(s) controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

11

and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); Burgess, 537 F.3d at 128. Treating physicians' opinions that are inconsistent with the opinions of other medical experts cannot be given controlling weight, but expert opinions that are not sufficiently substantial will not undermine the opinion of a treating physician. Burgess, 537 F.3d at 128-29 (citing Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)).

The ALJ incorrectly assigned greater weight to the opinions of consultative examiners over the well-supported opinions of the treating physicians. Plaintiff's treating physicians, Dr. Peets[3] and Dr. Lu,[4] both opined that Plaintiff's mental limitations significantly interfere with his functioning. Tr. at 469, 473. The ALJ's conclusion that Dr. Lu's opinion is not supported by medical evidence is contrary to the evidence in the record. Tr. at 39, 468. Dr. Lu's opinion was based on clinically

---

[3] Although the ALJ gave some weight to the opinion of Dr. Peets, he erred in failing to specify how much weight. Tr. at 32-40. If a treating physician's opinion is not given controlling weight, the ALJ must specifically determine the weight that the opinion should receive. See 20 C.F.R. § 404.1527(d)(2). The ALJ stated that he relied only on the opinions of one-time consultative physicians in determining Plaintiff's RFC. Tr. at 40. Therefore, because the ALJ did not give Dr. Peets controlling weight, he should have considered the factors set out by the SSA to assign a weight. See 20 C.F.R. § 404.1527(d)(2). This failure alone would warrant remand. See Halloran, 362 F.3d at 33; Snell, 177 F.3d 128, 133 (2d Cir. 1999).

[4] The ALJ erred in determining that Dr. Lu was not a treating source. Tr. at 37. The regulations define a treating source as an "acceptable medical source" that has provided an individual "medical treatment or evaluation" and "has, or has had, an ongoing treatment relationship" with the claimant. See 20 C.F.R. § 404.1502. There is no uniform threshold for qualification as a treating source; any "frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [claimant's] medical condition(s)" may suffice. Id. A provider who treats a claimant only a few times may be a treating source "if the nature and frequency of the treatment or evaluation is typical for [claimant's] conditions." Id. Dr. Lu has provided specialized neuropsychological treatment at least three times over the course of two years. Tr. at 396, 467. Dr. Lu evaluated Plaintiff's cognitive and emotional functioning beginning in 2007, and re-evaluated Plaintiff's functioning at least two times between 2007 and 2009, establishing an ongoing course of treatment sufficient to deem Dr. Lu a treating physician. Id.

accepted tests that he administered to Plaintiff. Id. at 468. Furthermore, Dr. Lu's opinion is consistent with other opinions in the record, notably the opinions of Dr. Knudsen and Dr. Santana-Garcia. Dr. Santana-Garcia, a psychiatrist that examined Plaintiff in 2007, diagnosed him with depressive disorder and cognitive disorder. Tr. at 272. Similarly, Dr. Knudsen noted that there was a significant problem with Plaintiff's cognitive functioning. Tr. at 264-265. Dr. Lu's opinion is supported by diagnostic techniques and is not inconsistent with the other substantial evidence in the record, and therefore should be afforded controlling weight. See 20 C.F.R. § 404.1527(c)(2). Additionally, the ALJ erred in finding that Dr. Peets' opinion indicated only that there were "no worsening clinical findings in the notes from 2007-2010." Id. at 37. The ALJ omitted the nine visits in less than a year where Plaintiff complained of worsening symptoms, including post-traumatic headache. Tr. at 480-95.

The ALJ also erred in granting "great weight" to the opinions of one-time consultative physicians Dr. Magurno and Dr. Shapiro. The ALJ stated that Dr. Magurno's determination that Plaintiff has moderate limitations for lifting, carrying, and repetitive bending, and only mild limitations in standing or walking, is significant because it is based on objective clinical and laboratory findings. Tr. at 43. Furthermore, the ALJ stated that the opinion of consultative psychologist Dr. Shapiro—that "patient's psychiatric symptoms are mild and transient in nature"—is supported by objective medical evidence, including records after Plaintiff's second traumatic brain injury. Id. Additionally, the ALJ gave greater weight to Dr. Shapiro's opinion because "Dr. Shapiro had the opportunity to examine [Plaintiff] and her opinion is more consistent with the record in its entirety." Id. at 40. However, the ALJ did not adopt Dr. Shapiro's diagnosis in April 2009 for mild mental retardation because it "is not fully supported by the record" and "Plaintiff does

13

not have significant deficits in adaptive functioning consistent with a diagnosis for mild mental retardation." Id. at 30.

The opinion of a consultative physician, "who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist." See Spielberg v, Barnhart 367 F.Supp.2d 276, 282-83 (E.D.N.Y. 2005). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." Id.

With regard to Plaintiff's psychiatric symptoms, substantial evidence does not support the ALJ's assignment of greater weight to Dr. Shapiro's opinion than to the opinions of the treating physician and psychologist. The record does not support Dr. Shapiro's opinion that Plaintiff's symptoms are mild and transient in nature. The opinions of Dr. Lu, Dr. Knudsen, Dr. Santana-Garcia, and Dr. Peets all establish that Plaintiff's symptoms are not transient, but rather have persisted without significant improvement since his traumatic brain injury. Tr. at 251-72; 394-97. Furthermore, the ALJ chose to disregard the only portion of Dr. Shapiro's opinion that established that Plaintiff had a low IQ score that may be indicative of serious cognitive deficits. Id. at 30. The ALJ used the very same reasoning for his rejection of the opinions of Dr. Lu and Dr. Knudsen as his adoption of the opinions of the onetime consultative physicians Dr. Shapiro and Dr. Magurno. Furthermore, the ALJ chose to address only those parts of Dr. Peets' opinion that were unfavorable to Plaintiff's disability claim, such as Plaintiff's tendency to seek controlled pain medication. Id. This case must therefore be remanded for redetermination of Plaintiff's RFC.

### C. Establishing Existence of Significant Work

Plaintiff also argues that the ALJ presents no substantial evidence to support the conclusion that there is significant work in the national economy that Plaintiff can perform. Pl.'s Br. at 20. Plaintiff further argues that the ALJ did not meet his burden to establish that there is other work because he: (1) relied upon the Medical-Vocational Rules in 20 CFR § 404, Subpart P, Appendix 2 in reaching his conclusion; (2) he concluded that Plaintiff's nonexertional impairments "have little or no effect" on his occupational base, contradicting his prior finding that Plaintiff's depression is "severe"; and (3) he failed to procure vocational expert testimony, even though Plaintiff's disability claims are nonexertional and therefore require expert testimony. Id. at 20-23.

At Step 5 of the sequential evaluation, the burden is on the Commissioner to prove that "there is other gainful work in the national economy which the Plaintiff could perform." Monette v. Astrue, 269 F. App'x 109, 111 (2d Cir. 2008) (quoting Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998)). "When an individual's impairments and related symptoms are purely exertional, and the individual's vocational profile is listed in the regulations, then the Medical Vocational Guidelines (the Grids) are applied directly to determine whether the individual is disabled or not disabled." Anderson v. Comm'r of Soc. Sec., No. 08-CV-850, 2009 WL 3064764, *8 (N.D.N.Y. Sept. 22, 2009) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b)). If properly applied, the Grids results fulfill Step 5 without the requirement of a vocational expert. Id. However, "where significant nonexertional impairments are present at the fifth step in the disability analysis . . . 'application of the grids is inappropriate.'" Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir. 1999) (citing Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986)). In such a case, the ALJ must introduce the testimony of a vocational expert or other similar evidence. Id. Because the ALJ has improperly applied the

15

standards governing Plaintiff's RFC, on remand he must also reconsider whether Plaintiff has significant nonexertional impairments for the purposes of Step 5 analysis.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's decision is **VACATED** and the case is **REMANDED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED: March 31, 2014
Albany, NY

Lawrence E. Kahn
U.S. District Judge